**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| M.G., a minor, by and through his parent and natural guardian R.G.; G.J., a minor, by and through his parent and natural guardian, C.J., on behalf of themselves and a class of those similarly situated; and BRONX INDEPENDENT LIVING SERVICES, a nonprofit organization,<br><br>             Plaintiffs,<br><br>-against-<br><br>THE NEW YORK CITY DEPARTMENT OF EDUCATION; THE CITY OF NEW YORK; CARMEN FARIÑA, in her official capacity as Chancellor of the New York City Department of Education,<br><br>             Defendants. | No.<br><br>**<u>COMPLAINT</u>** |

## <u>INTRODUCTION</u>

1.       This civil rights lawsuit challenges Defendants' systemic abdication of their duty to provide students with disabilities attending public school in the Bronx with appropriate "related services" in accordance with their legally required Individualized Education Programs ("IEPs").

2.       Related services include speech/language therapy, occupational therapy ("OT"), counseling services, and tutoring services, among other services that students with disabilities need to have equal access to an appropriate public education.

3.       Related services should be, and typically are, provided at a child's school during the school day or soon thereafter. This ensures that students with disabilities have access to these necessary, federally-mandated services.

-1-

4.      Yet Defendants have a policy under which they issue vouchers[1] for related services to thousands of parents across New York City ("the City"), requiring them to secure the related services for their child on their own, using the voucher as payment.

5.      Under the voucher program, Defendants provide parents, many of whom are low-income and members of underserved communities, with confusing and out-of-date referral lists for contract providers. Many of the providers on the lists are unable or unwilling to come to the neighborhoods in the Bronx where the children live and go to school, or no longer accept the vouchers at all.

6.      Unsurprisingly, the New York City Department of Education ("DOE")'s internal data shows that the vouchers for related services offered through this program go unused at alarming rates across the City's thirty-two geographic school districts. In the 2015-2016 school year, nearly half of the 9,164 vouchers issued by the DOE went unused, meaning thousands of the City's school children with disabilities did not receive their federally mandated services.

7.      In the Bronx, the vouchers go unused at high rates. For example, in Districts 8, 9, 10, and 11 in the Bronx, the vouchers go unused at rates of 91%, 63%, 71%, and 66%, respectively. Across the Bronx, the DOE's method for providing over 2,000 legally-mandated related services is dramatically falling short as over 63% of the vouchers went unused in 2015-2016.

8.      Students with disabilities are harmed by the DOE's failure to provide these services. For example, Plaintiff M.G. missed OT services in critical development years and lost

---

[1] The DOE issues these vouchers when it cannot provide related services on-site. Many of these vouchers are referred to as Related Service Authorizations ("RSAs"). However, vouchers for Special Education Teacher Support Services ("SETSS"), which include tutoring, are called P-3 Letters. For ease of reference, Plaintiffs will refer to both RSAs and P-3 Letters as "vouchers" throughout the Complaint.

the opportunity to develop motor skills that would help his academic development, including the ability to hold a pen.

9.      The DOE is aware of the rates of failure to provide these services, but has no procedure to follow-up with the families when vouchers are unused and no plans to rectify the broken system.

10.      The violations of these students' civil rights and illegal deprivations of educational services at schools in the Bronx are rampant and widespread.  By failing to effectively provide appropriate related services to these children, Defendants deny Plaintiffs their rights in violation of the Individuals with Disabilities Education Act ("IDEA"), the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and the New York City Human Rights Law ("NYCHRL").

11.      Plaintiffs seek declaratory and injunctive relief in the form of an order finding Defendants out of compliance with relevant education and discrimination laws and directing Defendants to provide a free appropriate public education ("FAPE") and equal access to education for all students with disabilities in the Bronx.

## JURISDICTION

12.      Plaintiffs bring claims under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq.; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and NYCHRL, N.Y.C. Admin. Code § 8-101 et seq.

13.      This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4) as this is a civil action arising under the laws of the United States.  This Court has jurisdiction over the supplemental claims arising under New York City

law pursuant to 28 U.S.C. § 1367(a). Moreover, this Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

14.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District because Defendants are located within this District. Moreover, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## PARTIES

15.    Plaintiff M.G. is a nine-year-old child and a resident of the Bronx. At the time of filing, he attends a public school located in the Bronx. His next friend is his mother, R.G.

16.    M.G. has been diagnosed with Asperger's Syndrome and has been classified as autistic pursuant to the IDEA. This impairment substantially limits one or more of the major life activities of M.G., making him an individual with a disability for the purposes of Section 504 and the ADA. M.G. also has weak muscle tone in his hands, a condition that impairs his ability to write and for which he requires occupational therapy. At the time of filing, M.G. attends a DOE school and, as such, is qualified to participate in the programs, services, and activities of the DOE.

17.    Defendants issued his parent, R.G., a voucher called a Related Services Authorization ("RSA") for occupational therapy services that M.G. was denied during the 2013-2014 school year. R.G. has attempted to use the RSA, but has been unable to find an appropriate provider over the past three years. She is still actively searching for a provider to use the RSA. The RSA expires in August 2018.

18.    Plaintiff G.J. is a twelve-year-old child and a resident of the Bronx. At the time of filing, he attends a public school located within the Bronx. His next friend is his mother, C.J.

4

19.    G.J. has been diagnosed with Down syndrome, autism, and asthma.  He has been classified as having multiple disabilities pursuant to the IDEA.  These impairments substantially limit one or more of the major life activities of G.J., making him an individual with a disability for purposes of Section 504 and the ADA.  G.J. has significant difficulty with his fine motor skills and requires occupational therapy to develop prewriting skills including holding and using writing utensils.  At the time of filing, G.J. attends a DOE school, and, as such, is qualified to participate in the programs, services, and activities of the DOE.

20.    Defendants issued his parent, C.J., a voucher for occupational therapy services that G.J. was denied during the 2016- 2017 school year.  C.J. reviewed the RSA and the extensive list of providers given to her with the RSA.  She was deterred from inquiring further due to her lack of transportation and child care options that would be necessary to get G.J. to services outside of school hours.

21.    Plaintiff Bronx Independent Living Services is an independent living center serving persons with disabilities who live in the Bronx.  Founded in 1983, BILS is a consumer-based, nonprofit organization that provides advocacy and services for individuals with disabilities to live fully integrated lives in society.

22.    BILS' mission is to ensure full integration, independence, and equal opportunity for all people with disabilities by removing barriers to the social, economic, cultural, and civic life of the community.

23.    Approximately 60% of BILS' board members and approximately 65% of BILS' staff members are persons with disabilities.

24.    BILS provides services to almost 3,000 people per year, and BILS serves individuals with disabilities as well as their family members.

25.     BILS' constituents include children with disabilities and their parents who attend public schools in the Bronx and need related services and thus may receive or are at risk of receiving RSAs.

26.     BILS has suffered an injury-in-fact due to Defendants' failure to provide related services to students with disabilities in the Bronx.  As a result, BILS has had to divert resources for intakes from parents of children who have been denied these services as well as tracking and following up with these intakes.

27.     Additionally, BILS serves constituents, both children with disabilities and parents of children with disabilities, who have suffered injury due to Defendants' actions and inactions regarding the provision of related services to students with disabilities.

28.     Defendant City of New York was, and is, a municipal entity created and authorized under the laws of the State of New York.  State law vests control of the New York City Department of Education with a Chancellor who is appointed by the Mayor of the City of New York.  N.Y. Educ. Law § 2590-h.  The Chancellor is tasked with overseeing every aspect of the schooling of New York City children, from underperforming schools to procurement policy to special education programs.  The City is a recipient of federal financial assistance related to the provision of educational services within the meaning of Section 504 of the Rehabilitation Act.

29.     Defendant New York City Department of Education is responsible for operating the public school program in New York City, including providing a free and appropriate public education to children with disabilities.  Defendant DOE is a recipient of federal financial

assistance to operate its school system and services within the meaning of Section 504 of the Rehabilitation Act.[2]

30.    Defendant Carmen Fariña is the Chancellor of the New York City School District ("the Chancellor") and as such is entrusted with powers and duties set forth in N.Y. Educ. Law § 2590-h.  The Chancellor is sued in her official capacity.

## CLASS ALLEGATIONS

31.    Plaintiffs bring this action individually and on behalf of all persons similarly situated pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

32.    The class consists of students with disabilities who are now or will be entitled to related services under their IEPs and attend schools in the Bronx.

33.    The persons in the class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit to the parties and to the Court.  Indeed, the DOE's own information demonstrates that the class of persons consists of thousands of children in the Bronx.

34.    There are questions of law and fact common to the class.  All individuals are subject to the same system-wide voucher policies and procedures, namely the "Citywide Related Services Policy and Practice: Assignment of Related Service Providers," implemented by the DOE, the legality of which will be determined under IDEA, Section 504, the ADA, and the NYCHRL.

35.    The claims of the Plaintiffs are typical of the claims of the class.  Plaintiffs have been and are being denied their legal right to a free appropriate public education by Defendants

---

[2] The DOE is formally known as the Board of Education of the City School District of the City of New York. *See* N.Y. Educ. Law § 2590-b(1)(a).

due to Defendants' policy of providing vouchers for related services instead of ensuring that eligible students receive such services.

36.    Plaintiffs will fairly and adequately protect the interests of the class.  There are no conflicts between the Plaintiffs and other class members.  Plaintiffs have retained counsel experienced in class litigation relating to education, special education, and the civil rights of persons with disabilities.

37.    Defendants have acted and/or failed to act on grounds generally applicable to the class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

38.    Plaintiffs cannot exhaust their educational due process administrative remedies pursuant to IDEA because it is futile and impossible to do so.  Exhaustion through individual due process claims in Defendants' Impartial Hearing Office is impossible because the harms that the individual plaintiffs allege and the remedies they seek are systemic.  Systemic deficiencies are not capable of review in a particular student's due process claim, nor is systemic relief available as a remedy in such a case.  Thus, an effort to exhaust for the individual plaintiffs would be futile.  Additionally, it is impossible for BILS to exhaust its claims for the organizational harms it has suffered through Defendants' Impartial Hearing Office.

## LEGAL FRAMEWORK REGARDING THE DOE'S OBLIGATION TO PROVIDE RELATED SERVICES TO STUDENTS WITH DISABILITIES

39.    Federal and City disability laws – the IDEA, Section 504, the ADA, and the NYCHRL – require the DOE to provide students with disabilities with a free appropriate public education and equal access to education.

40.     The IDEA defines FAPE as "special education and related services that . . . have been provided at public expense, under public supervision and direction, and without charge . . . [and that] meet the standards of the State educational agency."  20 U.S.C. § 1401(9).

41.     According to the IDEA, related services are defined as:

"transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children."  20 U.S.C. § 1401(26)(A).

42.     Special education and related services are laid out in each student's IEP, which must be individually tailored to each student's educational needs.  20 U.S.C. §1414(d).  IEPs must be in place for each student with a disability at the beginning of each school year.  20 U.S.C. § 1414(d)(2).

43.     The Americans with Disabilities Act and the Rehabilitation Act of 1973 also provide for equal access in education.  Such access can be achieved through, among other things, reasonable modifications to policies, practices, and procedures; changes in methods of administration; and revisions to eligibility criteria.

44.     Additionally, the New York City Human Rights Law mandates that educational institutions do not discriminate against students with disabilities.

45.     Thus, the DOE's legal duties under relevant laws are quite clear:  The DOE must provide students with disabilities with the related services that are listed in their IEPs at the start of each school year, for free.

9

## FACTUAL ALLEGATIONS

### *The New York City Department of Education*

46.     The New York City Department of Education operates a school system serving around one million children dispersed throughout thirty-two geographic school districts across the five boroughs.  For the 2017 financial year, the DOE had an operating budget of $22.9 billion.

47.     Nearly 200,000 students in the New York City public school system have an IEP. The DOE serves these students with disabilities in a variety of educational settings.  A sizeable portion of these students – approximately 25,000 students in the 2015-2016 school year – are not served in the thirty-two geographic school districts but rather in the DOE's citywide, segregated school district for students with disabilities known as District 75.  According to the DOE's website, District 75 is intended to serve students who "are on the autism spectrum, have significant cognitive delays, are severely emotionally challenged, are sensory impaired, and/or are multiply disabled."

### The DOE's Policies and Practices for Providing Related Services

48.     According to the DOE's "Family Guide to Special Education Services for School-age Children" ("Related Services Guide"), the purpose of related services is "to advance the achievement of a student with a disability in connection with his or her educational program."

49.     In terms of the location for related services, the DOE's Related Services Guide provides that related services should be "integrate[d] into the classroom" when it is appropriate. Additionally, the DOE's Related Services Guide states that "[r]elated services should be closely coordinated with the student's teachers, other instructional personnel, and parents/guardians in support of instructional goals."

50.     Effective related services are critical for students with disabilities to meet their instructional goals.  The Related Services Guide shows examples of how related services can help students at each stage of their education:

i)   Pre-K:  "Related Services often focus intensively on supporting improved skills and behavior."

ii)  Kindergarten:  "Related Services continue to focus on improving skills and behavior. To increase independence, therapists work with teachers to identify possible changes to school-related activities and the learning environment."

iii) Elementary:  "A therapist working with the student during class activities often becomes essential in helping the student meet intensified academic demands. Services continue to focus on improving foundational skills in the early elementary years. Therapists may work with the classroom teacher to adapt activities and the classroom environment to meet the needs of the student and help the student access the curriculum."

iv)  Middle School:  "For some students, the pace of progress may slow down or level off as academic demands grow; students often start to become more aware of their learning differences.  Therapists help the student develop effective learning strategies while continuing to work with classroom teachers to adapt activities and the classroom environment as needed to help students successfully achieve their IEP goals.  Students may benefit from learning new skills specific to pre-vocational and ADL programs."

v)   High School:  "When therapy continues to be needed, the emphasis is typically on college and career readiness.  Services often focus on appropriate modification of

activities and learning environment.  Some students may require support to meet their

IEP goals and continue to improve skills required for pre-vocational, ADL and

college and career readiness programs."

51.     According to the DOE's "Citywide Related Services Policy and Practice:

Assignment of Related Service Providers" ("Related Services Policy"), the DOE follows a three-

step process to identify a related service provider.

52.     First, the DOE attempts to use an internal DOE provider to deliver the related

service.

53.     If the DOE does not have an internal DOE provider who can provide the related

services, which is often the case, the DOE's policy is to attempt to contact three contract

agencies – and give each agency five days to respond.  If the contract agencies do not respond in

five days, under the DOE's system-wide policy, the DOE then places the burden on the parent to

secure related services for their child by issuing the parent a voucher, in the form of an RSA or a

P-3 Letter.[3]

54.     According to the DOE's Related Services Guide, "[a]n RSA allows the parent to

use the services of an appropriately licensed, independent provider of the recommended related

service(s) at no cost to you.  Your child's public school can help you with this process."

However, the Related Services Policy and Guide offers no rationale explaining why parents of

children with disabilities are better positioned than the DOE to identify appropriate providers for

these difficult-to-serve areas.

---

[3] A P-3 Letter authorizes reimbursement for Special Education Teacher Support Services, typically tutoring-like services.  As with RSAs, P-3 Letters place the onus on parents to secure related services for their children.

55.     Along with the notice that their child is eligible to receive related services through a voucher, parents receive a list of providers that can be over a hundred pages long and contains the names of hundreds of providers for the parents to call.[4]

56.     Despite the fact that these provider lists state they were updated in April 2017, many providers on the list are no longer operating or are at capacity.  Those who do have available appointments may not be willing to travel to visit clients, making it difficult-to-impossible for working parents to take their children to appointments, especially when the child attends school in a borough with relatively few providers.

57.     Additionally, the help that the DOE claims to provide to parents is often non-existent.  The DOE typically does not help to call providers or schedule appointments; it does not arrange for childcare; and it cannot arrange for leave from work for parents who must take time off each week to ensure that their children are getting the services to which they are entitled under the law.

58.     The DOE is aware that RSAs are largely ineffective in providing legally-mandated related services to students with disabilities.  According to a document created by the DOE about the use of RSAs during the 2015-2016 school year, "RSAs often don't result in service because they are paper vouchers sent to parents.  While we work hard to support parents throughout the process, it can be challenging and time consuming for them to navigate."

59.     Despite the DOE's recognition of the ineffectiveness of the paper vouchers, it continues to issue them to parents.

---

[4] The DOE has two lists for many classes of providers – one that the DOE labels "Independent Providers for School-Age Students By Service (During and After School Hours)" and another labeled "Additional Options with DOE Providers."  For Occupational Therapists, the first list is 221 pages long, and the second list is 53 pages long.

**The Public Advocate's Investigation into the DOE's Lists of Independent Related Service Providers**

60.     In July 2017, the Public Advocate for the City of New York, Letitia James, published a report "Denial of Service: New York City Schools Are Failing to Provide Mandated Supports to Children with Disabilities"("the Public Advocate's report").  The Public Advocate's report detailed an in-depth investigation conducted by the Public Advocate in collaboration with Plaintiffs' counsel into the City's reliance on RSAs.  It is available at

http://pubadvocate.nyc.gov/sites/advocate.nyc.gov/files/denial_of_service_report_7717_1.pdf.

61.     The Public Advocate's report details a phone survey that the Office of the Public Advocate conducted – calling over 250 occupational therapy and speech therapy providers to determine how easy or difficult it is for parents to find a provider with available appointments and who is willing to travel to the Bronx.  The DOE provides two lists for most related services – a shorter list of the DOE providers and a longer list of independent providers.

62.     According to the Public Advocate's report:

> On the shorter DOE provider lists, the Public Advocate's Office called all 27 speech therapists identified as providing services in the Bronx and 51 of the occupational therapists identified as providing services in the Bronx. Additionally, the Public Advocate's Office called a random sample of 51 citywide speech therapists and 45 citywide occupational therapists from these lists.  Of the 27 speech therapists listed as providing services in the Bronx, only two had any availability; both were willing to travel to the Bronx.  Of the 51 occupational therapists listed as providing services in the Bronx, only two had any availability; both were willing to travel to the Bronx.  Of the 96 calls placed to DOE providers of speech therapy and occupational therapy who were not affirmatively listed as providing services in the Bronx, only two were available and willing to travel to the Bronx.

> With the longer lists of independent providers, the Public Advocate's Office called a random sample of 50 speech therapists and 50 occupational therapists listed as providing services in the Bronx.  None of these providers were willing to travel to the Bronx to provide services.

14

63.    In other words, of 274 calls made, only six providers had available appointments and were willing to travel to the Bronx.

64.    The Public Advocate's Office focused its investigation on the Bronx, which is the poorest borough in New York City, with 58.7% of its residents living in or near poverty.  The Bronx also has the highest incidence of family homelessness citywide.  Districts 8, 9, 10, and 11 in the Bronx are host to 124 homeless shelters, with 22,735 homeless school age children. District 8, where 91% of the RSAs went unused, has some schools where every child qualifies for free lunch, and a high rate of homelessness as one out of six students experienced homelessness in the last five years.  In District 9, where 63% of the RSAs went unused, more than 80% of students qualify for free or reduced lunch and one out of four students experienced homelessness in the last five years.

65.    The students in these Bronx school districts, who are some of the most vulnerable in the City, must also bear the brunt of the DOE's neglect, as the Public Advocate's report detailed the extremely low rates of RSA usage in these districts.  For example, according to the Public Advocate's report, "[o]f the 129 RSAs that the DOE issued in District 8, only 12 resulted in children receiving the services that they are legally entitled to.  Of the 365 RSAs that the DOE issued in District 9, 229 went unused."

66.    The Public Advocate's report also details the impact of this failure on the DOE's part to provide these services as the Public Advocate discovered that "the City's use of RSAs has resulted in children going without necessary services, falling behind academically, and failing to meet developmental milestones."

**The DOE's Systemic Abdication of Its Duty to Provide Related Services to Students with Disabilities in the Bronx**

67.     The DOE systemically fails to provide students with disabilities with special education services in the Bronx.  In Bronx public schools, rather than take steps to ensure that related services are delivered to the children whose parents received vouchers, the DOE abdicates its duty to provide students with disabilities with an educational program that is reasonably calculated for them to make academic progress.

68.     According to the DOE's own data, the rate of unused RSAs throughout the DOE's school districts is abysmal.  Indeed, almost half of the more than 9,000 vouchers issued by the DOE went unused citywide.  Twenty-one of the DOE's thirty-two geographic districts have an RSA non-usage rate of over 50%.  Across Bronx public schools, over 63% of the vouchers issued to students with disabilities went unused.  Additionally, the DOE retains the funding that would have been spent on related services for each unused voucher.

69.     Even when RSAs are successfully used to get related services, the child often has to wait weeks, months, or even years to receive the services.

70.     The DOE's failure to provide related services through RSAs is the worst in school districts with some of the highest rates of poverty.  For example, in Districts 8, 9, 10, and 11 in the Bronx, 91%, 63%, 71%, and 66% of the RSAs, respectively, go unused.  These districts have high rates of students living in homeless shelters and who transfer in or out of the district in the middle of the year.

71.     For children who receive RSAs, the DOE does not analyze whether the services should be integrated into the classroom based on the students' educational needs, as the law requires.  Instead, the DOE bases its decision on the location of related services on its own failure to identify appropriate providers for legally-mandated services.

16

72.     The DOE also fails to provide adequate transportation to students with disabilities who are supposed to receive related services through RSAs in the Bronx.  Parents are often forced to arrange and/or provide transportation for their children or are forced to forego needed services for their children because they are unable to provide transportation to and from RSA providers.

### *Plaintiffs' Individual Allegations*

### M.G.

73.     M.G. is a nine-year-old boy with Asperger's Syndrome and weak muscle tone in his hands.  Currently, M.G. is in third grade at a public school in the Bronx.

74.     The DOE has classified M.G. as having autism.  He was first found eligible for services under the IDEA prior to starting school.

75.     In 2013, M.G. entered kindergarten at a public school in the Bronx.

76.     M.G.'s 2013-2014 IEP listed OT as a related service.  M.G. needs OT to help him develop his writing ability, especially because of the weak muscle tone in his hands.  However, the DOE did not provide M.G. with any OT whatsoever during the 2013-14 school year.

77.     The DOE has provided R.G. no support as she has attempted to secure OT for M.G. throughout the last three years.  R.G. had to take the DOE to mediation and an impartial administrative hearing before the DOE would even grant an RSA for M.G.

78.     Once the DOE granted the RSA, R.G.'s three-year search for an appropriate provider began.

79.     For approximately one year, R.G. called OT providers from the DOE list in an attempt to get her son the OT services he was entitled to under the law.  However, she could not identify an OT provider who would travel to the Bronx for the rate that the DOE was offering.

80.     As a result, R.G. was forced to file another due process complaint requesting that the DOE increase the rate for her RSA.  Once again, R.G. prevailed.  On November 11, 2016, the DOE agreed to raise the rate of her RSA to $105.00, with the RSA set to expire in August 2018.

81.     Since then, R.G. and her attorney have called over forty OT providers.  The providers are either at capacity, unwilling to travel to her to provide the services, or can only provide services during school hours.

82.     For the OT providers far away from her residence in the Bronx, R.G. would have to employ someone to care for her other children and provide transportation for M.G. to the OT services.  She cannot afford to pay for childcare every week.

83.     The OT providers who are willing to meet in the Bronx have only been willing to schedule appointments during or immediately following school hours, which would require R.G. to pull M.G. out of school to attend.  This would only compound M.G.'s existing educational challenges.

84.     Without assistance from the school in identifying an appropriate provider as the DOE's Related Services Policy claims to offer, R.G. has had to get help from a legal services attorney to counsel her through this process.

85.     Indeed, the DOE has not even provided her with an updated provider list since she received the voucher three years ago, despite the fact that it is aware that the voucher has not been used.  R.G. was unaware that the OT provider list had been updated after 2014.

86.     M.G.'s missed OT services at such a young age have had a lasting detrimental impact on his ability to progress academically.

87.     By the end of kindergarten, M.G. had stopped reading and writing.

88.     At the start of first grade, M.G. could barely hold a pen and his writing was completely illegible.  According to M.G.'s 2017 Assistive Technology Evaluation, "When M.G. began in first grade . . . he was unable to hold a pencil effectively and did not form letters legibly."  The seventy-two hours of OT would have helped him with this issue.

89.     The impact of the DOE's failure to provide M.G. with OT services, can still be seen in M.G.'s extremely slow writing.  M.G.'s 2016 Education Evaluation Report found that his written expression score is only at kindergarten level.  Because of this, he has been recommended for a trial period with a touch screen tablet to assist with his issues in writing.  It still takes him approximately fifteen minutes to write "My name is [M.G.]."  This impedes his ability to benefit from his education.

## G.J.

90.     G.J. is a twelve-year-old boy with Down syndrome, autism, and asthma. Currently, G.J. is in seventh grade at a public school located in the Bronx.

91.     The DOE has classified G.J. as having multiple disabilities.  He was first found eligible for services under the IDEA prior to starting school.

92.     In 2015, G.J. entered sixth grade.

93.     G.J.'s 2015-2016 IEP listed occupational therapy as a related service.  G.J. needs OT to help him develop his prewriting ability and daily living skills because of his difficulty with fine motor skills.  The DOE provided G.J. with only one month of OT during the 2015-16 school year, during the last month of that school year.

94.     In 2016, G.J. entered seventh grade.  G.J.'s 2016-2017 IEP again listed OT as a related service.  Despite the fact that the law requires that special education services be in place

at the start of the school year, school staff did not inform C.J. that G.J. was not receiving the mandated OT services at the start of the 2016-17 school year.

95.     Instead, in or around October 2016, after not receiving any information about whether G.J. was receiving OT, C.J. inquired as to whether G.J. was receiving this service.  She was told that the DOE had not been providing him with OT during the 2016-17 school year.

96.     In or around December 2016, the DOE issued an RSA and a version of the list of providers for OT to C.J. by giving the notices to G.J.  C.J. found both the RSA and provider list in G.J.'s backpack.

97.     After reviewing the list, C.J. was frustrated because she is unable to take G.J. to a provider outside of school hours two times per week given her parental responsibilities to her three other children, two of whom also have disabilities, and the significant difficulty of transporting G.J. to an outside provider.  Thus, C.J. was deterred from contacting any listed providers.

98.     The DOE provided no support to C.J. to assist her in securing related services for G.J.  The DOE never followed up with C.J. to check if G.J. was receiving his services or if the RSA was being used.

99.     The impact of the DOE's failure to provide G.J. with OT services can be seen in the loss of progress in his prewriting skills.  While G.J. was once able to hold and use a marker, he has largely stopped demonstrating that skill.  Further, he has not made additional progress in holding or using other writing utensils.

**Bronx Independent Living Services**

100.     The mission of BILS is to ensure full integration, independence, and equal opportunity for all people with disabilities by removing barriers to the social, economic, cultural, and civic life of the community.

101.    In furtherance of its mission, BILS seeks to improve the quality of life of New York City residents with disabilities through programs that empower them to gain greater control of their lives and achieve full and equal integration into society.  BILS accomplishes this goal through its services; through its advocacy for systems change to remove physical, attitudinal, and communication barriers to people with disabilities; and through its education and awareness programs.

102.    BILS has suffered an injury-in-fact because Defendants' failure to provide related services to students with disabilities forces BILS to divert resources for intakes, tracking, and follow-up investigations.  These intakes have been from parents of students with disabilities who attend public schools in the Bronx and need related services and thus may receive or are at risk of receiving RSAs.  As a result of the Defendants' failure to provide students with disabilities with related services, BILS has fewer resources to dedicate to its other programs.

103.    The injury of having to divert resources to address the inadequate educational services is ongoing and directly traceable to the actions of the Defendants in failing to provide adequate education for young people with disabilities.  This injury would be directly redressed by injunctive and declaratory relief.  In addition, each act of discrimination caused by Defendants' policies directly frustrates BILS' mission of ensuring full integration, independence, and equal opportunity for all people with disabilities because an appropriate education with related services is crucial to meeting these goals for students with disabilities.

104.    BILS also serves constituents who have suffered injury due to Defendant's actions and inactions.  BILS' constituent base includes students with disabilities in the Bronx. These constituents are youths with disabilities who attend New York City public schools in the Bronx, and who are being denied the individualized services they need in order to receive an

appropriate education.  BILS' constituents also include parents of young people with disabilities who can pursue their children's claims for denial of special education and equal access to education on behalf of their children.  BILS has heard from these constituents who have children with disabilities who have been denied related services by Defendants and may be eligible to receive RSAs under Defendants' current policy.  Therefore, one or more of BILS' constituents have been injured as a direct result of Defendants' discriminatory actions and failures to act and would have standing to sue in their own right.

105.    The interests that BILS seeks to protect in this litigation are germane to its purpose.  BILS is challenging Defendants' failure to provide legally-mandated related services to students with disabilities through the issuance of vouchers.  These interests are germane to BILS' purpose of ensuring full integration, independence, and equal opportunity for all people with disabilities by removing barriers to the social, economic, cultural, and civic life of the community.

106.    Plaintiffs' claims are limited to injunctive and declaratory relief for policy and systemic reforms which do not require the participation of individual BILS constituents in the lawsuit.

107.    The injury of having to divert resources to address the inadequate educational services for students with disabilities is redressable by the Defendants.  If the DOE ensured that students received the services and accommodations they need, when they need them, BILS would be able to re-direct resources toward its other priority areas.

## CAUSES OF ACTION

### Count I

### Violation of Individuals with Disabilities Education Act
### (20 U.S.C. § 1400, *et seq.*)

108.    Plaintiffs incorporate by reference each and every allegation contained in the

foregoing paragraphs as if specifically alleged herein.

109.    Under the Individuals with Disabilities Education Act, students with disabilities

are entitled to receive a free appropriate public education.  20 U.S.C. § 1400(d)(1)(a).

110.    IDEA defines a child with a disability as a child "with intellectual disabilities,

hearing impairments (including deafness), speech or language impairments, visual impairments

(including blindness), serious emotional disturbance . . . orthopedic impairments, autism,

traumatic brain injury, other health impairments, or specific learning disabilities . . . who, by

reason thereof, needs special education and related services."  20 U.S.C. § 1401(3); 34 C.F.R. §

300.8(a)(1).

111.    Each of the named individual plaintiffs has a disability as defined under IDEA.

The Plaintiff Class is defined to be students with disabilities who are now or will be entitled to

related services under their IEPs and attend schools in the Bronx.  Therefore, Plaintiffs and the

Plaintiff Class qualify as students with disabilities for the purposes of IDEA.

112.    As operators of a local educational agency (LEA), the Defendants have a duty to

provide FAPE to all students in New York City in accordance with the requirements of IDEA.

34 C.F.R. § 300.2(b).

113.    As defined by IDEA, FAPE includes "special education and related services that .

. . have been provided at public expense, under public supervision and direction, and without

charge . . . [and that] meet the standards of the State educational agency."  20 U.S.C. § 1401(9).

23

114.    The IDEA incorporates the standards of the state education agency into its definition of FAPE.  *See* 20 U.S.C. § 1401(9).

115.    Through their policies, procedures, and practices relating to their use of vouchers in the Bronx, the Defendants fail to meet their obligations under IDEA and state implementing regulations including, but not limited to:

i)    By failing to ensure students with disabilities receive the related services listed in their IEPs, the Defendants do not develop and implement appropriate IEPs for each child with a disability, in accordance with 20 U.S.C. § 1414(d);

ii)   Defendants fail to ensure the provision of related services that a child with a disability may need in order to benefit from their education, 20 U.S.C. § 1401(26)(A);

iii)  By failing to analyze whether the services should be integrated into the classroom based on the students' educational needs and instead basing their decision about the location of services on their own failure to identify appropriate providers, the Defendants do not provide a free appropriate public education to all students with disabilities, 20 U.S.C. § 1400(d)(1)(a), in the least restrictive environment, 34 C.F.R. §§ 300.550–300.556;

iv)   By relying on vouchers rather than ensuring that students have transportation to related service providers, Defendants do not provide "suitable transportation to and from special classes or programs"  N.Y. Educ. Law § 4402(4)(a).

116.    By failing to ensure students with disabilities who receive vouchers in the Bronx are provided with related services, Defendants have impeded students' right to a free appropriate

public education and/or have deprived students of an educational program that is reasonably calculated to ensure their educational progress.

117.    As a result, Defendants have violated and continue to violate rights secured by 20 U.S.C. §§ 1400 *et seq.*, and its implementing regulations at 34 C.F.R. §§ 300 *et seq.*

118.    Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies.  Further, as a direct result of Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm, including lost education opportunities.  Therefore, speedy and immediate relief is appropriate.

119.    Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs incurred in bringing this action under 20 U.S.C. § 1415(i)(3).

## Count II

### Violation of Americans with Disabilities Act
### (42 U.S.C. § 12101, *et seq.*)

120.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

121.    Title II of the ADA states, in pertinent part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity. 42 U.S.C. § 12132.

122.    A "public entity" includes state and local governments, their agencies, and their instrumentalities.  42 U.S.C. § 12131(1).

123.    The Defendants were, at all times relevant to this action, and currently are "public entities" within the meaning of Title II of the ADA.

124.    Defendants provided and provide "services, programs and activities" including educational programs, services, and activities in their schools in the Bronx.

125.    The term "disability" includes physical and mental impairments that substantially limit one or more major life activities.  42 U.S.C. § 12102(2).  A "'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

126.    Each of the named individual plaintiffs, and all others similarly situated, were, at all times relevant to this action, and are currently "qualified individuals with disabilities" within the meaning of Title II of the ADA.  They all have impairments that substantially limit a major life activity, and they all attend DOE schools and, thus, qualified – with or without reasonable modification – to participate in the programs, services, and activities of the DOE.

127.    By abdicating their duty to provide related services to students in the Bronx, Defendants have failed to provide Plaintiffs and members of the Plaintiff Class equal access to their programs and services, in violation of Title II of the ADA and its implementing regulations. *See* 42 U.S.C. § 12134; 28 C.F.R. § 35.101 *et seq*.  Defendants cannot contract away their legal duties to persons with disabilities.  28 C.F.R. § 35.130(b)(1).

128.    By failing to ensure that students with disabilities in the Bronx get the related services in their IEP, the educational services that the DOE offers are not equal to or the educational services are not as effective in affording equal opportunity as those offered to non-disabled students.  This conduct violates, among other provisions, 28 C.F.R. § 35.130(b)(1)(ii).

129.    Defendants fail to provide Plaintiffs and members of the Plaintiff Class with educational services that are as effective as those educational services available to their non-disabled peers, and thus deny youth with disabilities equal opportunity: (1) to obtain the same result, (2) to gain the same benefit, and (3) to reach the same level of achievement as their non-disabled peers.  Providing vouchers to parents of students with disabilities and abdicating Defendants' duty to ensure that these services are actually delivered does not constitute equal access to Defendants' education programs and services, nor can Defendants contract away their obligation to provide students with disabilities with equal access to such programs and services. As such, the educational services offered in the Bronx for students with disabilities are not sufficient to provide equal access to Defendants' education programs and services for Plaintiffs and members of the Plaintiff Class.  This conduct violates, among other provisions, 28 C.F.R. § 35.130(b)(1)(iii).

130.    Defendants fail to make reasonable modifications to their policies, practices, and procedures governing the delivery of related services and the assignment of related service providers even though these modifications are necessary to avoid discriminating against Plaintiffs and members of the Plaintiff Class, in violation of 28 C.F.R. § 35.130(b)(7).

131.    Specifically, Defendants fail to make reasonable modifications to their related services policies and practices to ensure that youth with disabilities have equal access to education.  Such reasonable modifications may include, but not be limited to, taking affirmative steps to make sure students receive their related services, such as providing additional qualified providers on-site, offering affirmative assistance in identifying appropriate and available providers, providing transportation to and from off-site service providers and tracking when vouchers are not used.

132.    By adopting the policies described above, Defendants tend to screen out students with disabilities who need related services from their educational programs and benefits.  The way to provide equal access to these children is through these related services, and by not taking steps to affirmatively provide those related services, Defendants effectively screen these students out.  This conduct violates, among other provisions, 28 C.F.R. § 35.130(b)(8).

133.    Defendants use methods of administration that have the effect of subjecting Plaintiffs and members of the Plaintiff Class to discrimination by reason of their disability because Defendants' policy and practice of using vouchers effectively denies students with disabilities in the Bronx services necessary for them to achieve educational progress.  As such, these methods of administration also have the purpose and effect of defeating or substantially impairing accomplishments of the objectives of Defendants' educational services in the Bronx with respect to Plaintiffs and members of the Plaintiff Class because these students with disabilities are denied equal access to education.  This conduct violates, among other provisions, 28 C.F.R. §§ 35.130(b)(3)(i) and (ii).

134.    Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies.  Further, as a direct result of Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm, including lost education opportunities.  Therefore, speedy and immediate relief is appropriate.

135.    Pursuant to 42 U.S.C. § 12133, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs incurred in bringing this action under 42 U.S.C. § 12205.

## Count III

### Violation of Section 504 of the Rehabilitation Act of 1973
### (29 U.S.C. § 794)

136.    Plaintiffs incorporate by reference each and every allegation contained in the

foregoing paragraphs as if specifically alleged herein.

137.    Section 504 provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States … shall,
> solely by reason of his or her disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to discrimination under any program or
> activity receiving Federal financial assistance[.]  29 U.S.C. § 794(a).

138.    Defendants were, at all times relevant to this action, and are currently recipients

of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, and

Defendants provided and provide a "program or activity" where "program or activity" is

described as "all the operations of" the recipient, which includes the educational programs and

activities in schools in the Bronx.  29 U.S.C. § 794(b).

139.    Plaintiffs and members of the Plaintiff Class were, at all times relevant to this

action, and are currently "otherwise qualified individuals with disabilities" within the meaning of

Section 504.  They all have impairments that substantially limit a major life activity, and they all

attend schools in the Bronx and are qualified—with or without reasonable modification—to

participate in the DOE's educational services.

140.    Defendants have violated the rights of Plaintiffs and members of the Plaintiff

Class secured by Section 504 and its implementing regulations.  *See* 28 C.F.R. § 41.1.

141.    By failing to ensure that students with disabilities in the Bronx get the related

services listed in their IEP, the services that the Defendants offer are not equal to or the

educational services are not as effective in affording equal opportunity as those offered to non-disabled students.  This conduct violates, among other provisions, 34 C.F.R. § 104.4(b)(1)(ii).

142.    Defendants fail to provide Plaintiffs and members of the Plaintiff Class with educational services that are as effective as those services available to their non-disabled peers, and thus deny youth with disabilities equal opportunity: (1) to obtain the same result, (2) to gain the same benefit, and (3) to reach the same level of achievement as their non-disabled peers.  Providing vouchers to parents of students with disabilities and abdicating Defendants' duty to ensure that these services are actually used does not constitute equal access to Defendants' education programs and services, nor can Defendants' contract away their obligation to provide students with disabilities with equal access to such programs and services.  As such, the educational services offered in the Bronx for students with disabilities are not sufficient to provide equal access to Defendants' education programs and services for Plaintiffs and members of the Plaintiff Class.  This conduct violates, among other provisions, 34 C.F.R. § 104.4(b)(1)(iii).

143.    Defendants fail to make reasonable modifications to their policies, practices, and procedures governing the delivery of related services and the assignment of related service providers even though these modifications are necessary to avoid discriminating against Plaintiffs and members of the Plaintiff Class, in violation of Section 504.

144.    Specifically, Defendants fail to make reasonable modifications to their related services policies and practices to ensure that youth with disabilities have equal access to education.  Such reasonable modifications may include, but not be limited to, providing additional qualified providers on-site, affirmative assistance in identifying appropriate providers,

tracking whether RSAs are actually used, and providing transportation to and from off-site service providers.

145.     Defendants use methods of administration that have the effect of subjecting Plaintiffs and members of the Plaintiff Class to discrimination by reason of their disability because Defendants' policy and practice of using RSAs effectively denies students with disabilities in the Bronx services necessary for them to achieve educational progress.  As such, these methods of administration also have the purpose and effect of defeating or substantially impairing accomplishments of the objectives of Defendants' educational services in the Bronx with respect to Plaintiffs and members of the Plaintiff Class because these students with disabilities are denied equal access to education.  This conduct violates, among other provisions, 34 C.F.R. §§ 104.4(b)(4)(i) and (ii).

146.     Through its policies, procedures, and practices relating to vouchers in the Bronx, the DOE fails to meet its obligations under Section 504's regulations including, but not limited to:

> i)   By failing to provide related services listed in students' IEPs, the DOE does not comply with its obligation to provide a free appropriate public education to each qualified handicapped person who attends schools operated by the DOE in the Bronx, 34 C.F.R. § 104.33(a) or its obligation to provide special education and related aids and services that are designed to meet the individual educational needs of handicapped persons as adequately as the needs of non-handicapped persons are met, 34 C.F.R. § 104.33(b);
>
> ii)  By failing to provide transportation for students who receive related services off-site, the DOE does not comply with its obligation to provide adequate

transportation to and from the aids, benefits, or services that are operated by third-parties "at no greater cost than would be incurred by the person or his or her parents or guardian if the person were placed in the aids, benefits, or services operated by the recipient," 34 C.F.R. § 104.33(c)(2).

147.    Because Defendants' discriminatory conduct is ongoing, declaratory relief and injunctive relief are appropriate remedies.  Further, as a direct result of Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm, including lost educational opportunities.  Therefore, speedy and immediate relief is appropriate.

148.    Pursuant to 29 U.S.C. § 794(a), Plaintiffs are entitled to declaratory and injunctive relief and to reasonable attorneys' fees and costs incurred in bringing this action.

## Count IV

### Violation of the New York City Human Rights Law
### (N.Y.C. Admin. Code § 8-101, *et seq.*)

149.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

150.    The New York City Human Rights Law provides that "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee or any place or provider of public accommodation because of the actual or perceived . . . disability . . . status of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ."  N.Y.C. Admin. Code § 8-107(4)(a).  Persons include all "natural persons, proprietorship, partnerships, associations, group associations, organizations, governmental bodies or agencies, corporations [and] legal representatives . . . ."  N.Y.C. Admin. Code § 8-102(1).

32

151.    Further, the term "place or provider of public accommodation" encompasses "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise made available."  N.Y.C. Admin. Code § 8-102(9).

152.    Educational institutions, defined as "kindergartens, primary and secondary schools, academies . . . and all other educational facilities," like those operated by Defendants, are contemplated within the definition of public accommodations in the NYCHRL.  N.Y.C. Admin. Code § 8-102(8).  Public education services constitute a service, accommodation, advantage, or privilege that is offered to the general public within the meaning of N.Y.C. Admin. Code § 8-102(9).  Defendants DOE and Fariña, the "managers" of the educational institutions, as "governmental bodies or agencies" are plainly "persons" within N.Y.C. Admin. Code § 8-102(1).

153.    Through their denial of related services in the Bronx through their voucher system, Defendants, in their role as the public education system's managers, violate § 8-107(4)(a) by denying to students with disabilities access to a service, accommodation, privilege, or advantage that is otherwise available to students without disabilities because students with disabilities need related services to have access to education.

154.    In addition, Defendants violate N.Y.C. Admin. Code § 8-107(15).  This provision mandates that covered entities must "make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question, provided that the disability is known or should have been known by the covered entity."  N.Y.C. Admin. Code § 8-107(15).  Because

this provision applies to all entities that must comply with N.Y.C. Admin Code § 8-107,

Defendants are bound by it.

155.    The provision of related services to students with disabilities is crucial to

providing students with disabilities access to education on equal terms with students without

disabilities.  Moreover, Defendants are aware that these students have disabilities because they

have IEPs.  Defendants' failure to ensure that these students receive their mandated related

services is thus a violation of the § 8-107(15) reasonable accommodation mandate.

156.    These violations are particularly grave in light of the "uniquely remedial" purpose

behind the NYCHRL.  The construction provision of this law expressly provides that each

section must be "construed liberally for the accomplishment of the uniquely broad and remedial

purposes thereof, regardless of whether federal or New York State civil and human rights laws,

including those laws with provisions comparably-worded to provisions of this title, have been so

construed."  N.Y.C. Admin. Code § 8-130.  Accordingly, Defendants' conduct is subject to a

much stricter standard than under state or federal law, and its liability under these provisions

must be determined separately and independently from its liability under the disability provisions

of either state or federal civil rights law.

157.    As a direct and proximate result of Defendants' violations of the NYCHRL,

Plaintiffs have been injured as set forth herein.

158.    Defendants' conduct constitutes an ongoing and continuous violation of the

NYCHRL.  Unless Defendants are enjoined from further violations, Plaintiffs will continue to

suffer injuries for which there is no adequate remedy at law.  In particular, Plaintiffs will suffer

irreparable harm in that they will continue to be discriminated against and denied the

accommodations, advantages, facilities, or privileges of the public schools in the Bronx, as well

as reasonable accommodations that would provide them the opportunity to benefit from them. Plaintiffs are accordingly entitled to injunctive relief and reasonable attorneys' fees and costs.

Wherefore, Plaintiffs pray for relief as set forth below.

## Count V

### Declaratory Relief

159.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs in this Complaint.

160.    Plaintiffs contend that Defendants have failed and are failing to comply with applicable laws prohibiting discrimination against students with disabilities in violation of IDEA, 20 U.S.C. § 1400 *et seq.*, and accompanying regulations; the ADA, 42 U.S.C. § 12101 *et seq.*, and accompanying regulations; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and accompanying regulations; and the NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq.*, and accompanying regulations.

161.    Defendants disagree with Plaintiffs' contention.

162.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

Wherefore, Plaintiffs pray for relief as set forth below.

### PRAYER FOR RELIEF

*Wherefore*, Plaintiffs, individually and on behalf of the class they represent, ask the Court to:

163.    Order that Plaintiffs may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

164.    Order and declare that the Defendants' conduct as alleged herein has violated, and continues to violate, IDEA, 20 U.S.C. § 1400 *et seq.*, and accompanying regulations; the ADA, 42 U.S.C. § 12101 *et seq.*, and accompanying regulations; Section 504 of the Rehabilitation Act,

29 U.S.C. § 794, and accompanying regulations; and the NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq.*, and accompanying regulations;

165.     Preliminarily and permanently enjoin Defendants from violating IDEA, 20 U.S.C. § 1400 *et seq.*, and accompanying regulations; the ADA, 42 U.S.C. § 12101 *et seq.*, and accompanying regulations; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and accompanying regulations; and the NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq*., and accompanying regulations;

166.     Order Defendants to provide Plaintiffs and the members of the Plaintiff Class a free appropriate public education and equal access to education for all students with disabilities attending public schools in the Bronx in compliance with all special education laws that protect such students;

167.     Order Defendants to develop and implement a remedial plan that includes new practices, policies, and procedures to ensure that all students in the Plaintiff Class receive their related services;

168.     Retain jurisdiction of this case until Defendants have complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future, absent continuing jurisdiction;

169.     Award Plaintiffs' attorneys' fees and costs, as provided by statute and law; and

170.     Any such other relief as the Court finds just and proper.

Dated:  July 27, 2017
       New York, New York

Respectfully submitted,

DISABILITY RIGHTS ADVOCATES

_____

Michelle Caiola
Seth Packrone
Rebecca Serbin
DISABILITY RIGHTS ADVOCATES
675 Third Avenue, Suite 2216
New York, NY 10017
Tel:  (212) 644-8644
Fax:  (212) 644-8636